# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

DR. SUNIL JAIN                                    )
                                                  )
            Plaintiff,                       )
                                                  )
      v.                                     )        CAUSE NO. 1:06-CV-17-TS
                                                  )
INTERNATIONAL TRUCK AND                           )
ENGINE CORPORATION                                )
                                                  )
           Defendant.                       )

## OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by the Defendant on June 8, 2007 (DE 55). The Plaintiff filed his Complaint on January 19, 2006 (DE 1). The Complaint states claims against the Defendant under Title VII, the Age Discrimination in Employment Act, the Equal Rights Under Law statute, and the Indiana common law. Plaintiff's Appendix A to the Memorandum in Opposition to Defendant's Motion for Summary Judgment elaborates that the Indiana common law claims are intentional infliction of emotional distress, mental anguish, and humiliation.

The Complaint alleges that these claims arose from the Defendant's discrimination against the Plaintiff on the basis of his race, national origin, ethnicity, religion, and age by maintaining a hostile work environment and by denying him promotions and other job benefits. Finally, the Complaint alleges that the Defendant terminated the Plaintiff's employment because of his race, national origin, ethnicity, religion, and age, and in retaliation for the Plaintiff's complaints about workplace discrimination. The Plaintiff responded to the Defendant's motion for summary judgment on July 9, 2007, (DE 58) and the Defendant replied on July 24, 2007 (DE

59). On August 7, 2007, the Plaintiff filed his Sur-Reply Memorandum in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (DE 60), and on August 23, 2007, the Defendant filed an Objection to Plaintiff's Proposed Sur-Reply (DE 61).[1]

For the reasons stated below, the Defendant's motion is GRANTED in part and DENIED in part.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002)

---

[1] The Defendant correctly argues that the Plaintiff's sur-reply is in violation of Local Rule 56.1 and this Court's briefing schedule. The Court therefore strikes the sur-reply.

(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe*, 43 F.3d at 443. However, under Northern District of Indiana Local Rule 56.1(b), the Court is to assume that the facts claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence.[2]

There is no separate rule of civil procedure governing summary judgment in employment discrimination cases. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997) (noting, however, that issues of intent, such as in discrimination cases, are often critical issues that are genuinely contestable). Summary judgment in favor of the defendant is hardly unknown, or for that matter rare, in employment discrimination cases. *Id*.

## FACTS

Construing all facts in a light most favorable to the Plaintiff, and drawing all legitimate inferences in favor of the Plaintiff, the following facts are assumed true for the purposes of

---

[2] The Defendant argues that the Plaintiff's Statement of Genuine Issues, appended to the Memorandum in Opposition to Defendant's Motion for Summary Judgment, is in violation of local rule 56.1(b). The Court finds that the Plaintiff's submission literally complies with the local rule, although the issues would have been better presented by specifically addressing each issue in the order stated by the moving party, as is the rule's intention and the usual practice.

summary judgment.

## A.    Factual Background

The Plaintiff was born in India in 1952. He has studied and worked in both India and the United States for significant periods of time. After graduating from secondary school in New Delhi, India, the Plaintiff earned a bachelor's degree in aeronautical engineering from the Indian Institute of Technology in Kanpur, India in 1974. He then went on to attain a master's degree in aerospace engineering from the University of Tennessee Space Institute in Tullahoma, Tennessee in 1981 and a doctoral degree in aerospace engineering from the Mississippi State University in Mississippi State, Mississippi in 1984.

In the interval between getting his bachelor's and master's degrees, the Plaintiff worked for the Defense Research and Development Organization in India from 1974 to 1979. After getting his doctorate, the Plaintiff worked for: the Supercomputer Computational Research Institute in Florida from 1985 to 1986; CHAM of North America in Huntsville, Alabama from 1986 to 1989; the University of Quebec at Chicoutimi, Canada from 1990 to 1991; KEI Engineering in Ann Arbor, Michigan from 1992 to 1993; Numerical Technology Corporation in Ann Arbor, Michigan from 1994 to 1995; and Caterpillar Incorporated in Peoria, Illinois from 1995 to 1999.

After a brief recruitment period, the Defendant hired the Plaintiff on March 1, 1999, to work in the aerodynamics department at the Defendant's Fort Wayne, Indiana facility. The Plaintiff left his position as a project engineer with Caterpillar in order to work for the Defendant. While the offer letter classified the Plaintiff's title as "senior project development engineer," the Defendant informed the Plaintiff within a few days after the Plaintiff began work

4

that his title was actually "project development engineer." Regardless of the precise title, at all times both parties understood the position to be an "L6" position.[3]  The terms of the Plaintiff's employment were not affected by the change in title.

Based on conversations with the Defendant during the Plaintiff's recruitment, the Plaintiff came to the Defendant's company with the understanding that he would be groomed to take over his supervisor's, Gene Olson, position once Olson retired. Olson's position was an L7 position with increased pay and responsibility. Once the Plaintiff commenced employment, the Defendant made no further overtures that the Plaintiff would eventually take over Olson's position.

Almost immediately after the Plaintiff began working for the Defendant, the Plaintiff became the target of frequent remarks related to his Indian descent and his religion from coworkers and, later, supervisors. The first comments were made by Greg Zeigler, who was a colleague of the Plaintiff's at International in the same department and who also reported to Olson.  His comments began within a couple of months of the Plaintiff's start date and included, "we don't care for Indian descent," (Jain July 18, 2006 Dep. 30, DE 58-5), and "Indians don't know anything." (Jain July 18, 2006 Dep. 32, DE 58-5.) The Plaintiff orally complained about these comments to Olson and to Elliot Lyons, Olson's supervisor, as early as August 1999. (Jain July 18, 2006 Dep. 43, DE 58-6.) Olson recommended that the Plaintiff ignore the comments, and Lyons instructed the Plaintiff not to "be oversensitive." (Jain July 18, 2006 Dep. 46, DE 58-6.)  The Plaintiff complained several more times to Lyons. After one such complaint, Lyons remarked to the Plaintiff that "Indians are very sensitive," (Jain July 18, 2006 Dep. 49, DE 58-6),

---

[3] The Defendant designates its employees' positions on an increasing scale of pay and seniority. L6 is one position below L7 on the hierarchy.

on another occasion that he hated Indian accents, (Jain July 18, 2006 Dep. 51, DE 58-6), and finally, that the Plaintiff needed "to learn the American way." (Jain July 18, 2006 Dep. 46, DE 58-6.)

Sometime late in 1999, Tom Harting, a colleague of the Plaintiff's who worked in the same department, commented to the Plaintiff that "I don't like non-Christians." (Jain July 18, 2006 Dep. 42, DE 58-6.)  Harting later became the Plaintiff's supervisor.  The Plaintiff did not complain to anyone about this particular comment.

Soon thereafter, Olson retired. The Plaintiff was not permitted to speak at the retirement party because Lyons felt that a group of 200 employees "won't like [sic] Indian accent." (Jain July 18, 2006 Dep. 35, DE 58-5.) After Olson retired, his position was advertised externally. When the Plaintiff expressed interest in the position, Lyons informed him that he would not be considered because the company wanted "young people." (Jain July 18, 2006 Dep. 34, DE 58-5.) The Plaintiff formally applied anyway around July 2000, but the Defendant declined to give the Plaintiff Olson's position. Instead, the Defendant gave him the title of  "acting manager" and continued to advertise the position both internally and externally.

Around April or May 2000, the company reorganized, and Dave Allendorph became the Plaintiff's supervisor. Allendorph also informed the Plaintiff that he would not be considered for the permanent manager position because "we want young people, we want Americans." (Jain July 18, 2006 Dep. 37, DE 58-5.) This preference arose from the fact that the manager was required to report to the CEO.

Within one week after Allendorph took over as the Plaintiff's supervisor, the Plaintiff began complaining to him about racially tinged remarks made by Zeigler and others that were

6

similar in nature to those previously described.[4] Following this series of complaints, Zeigler promised he would make no further comments. When the Plaintiff later made complaints about other employees, including a complaint about a perceived threat on his life,[5] he was told to ignore the comments or lose his managership.

While the Plaintiff was taking his complaints to Allendorph, the Plaintiff also alleges that Allendorph himself made offensive remarks.  For example, in reference to firing another employee, Allendorph remarked that he had gotten rid of a "foreigner." (Jain July 18, 2006 Dep. 92, DE 58-8.)  Later, Allendorph accused the Plaintiff of "insulting Americans" and told him to "go back to your country." (Jain July 18, 2006 Dep. 112, DE 58-9.)

At the time of the reorganization, in April or May 2000, Ed Melching became the director overseeing the Plaintiff's group, although Allendorph remained the Plaintiff's immediate supervisor.  It was Mr. Melching's decision at that time to deny the Plaintiff Olson's managership. The Plaintiff does not know the basis for Melching's decision and is unaware of whether the decision was based on his membership in a protected class. (Jain July 18, 2006 Dep. 70, DE 58-7.) The remarks from coworkers continued. Sometime early in 2002, the Plaintiff complained to Melching, who on one occasion responded that Allendorph should take care of the problem, and on another occasion that it was the Plaintiff's job to take care of the situation.

In April 2001, Allendorph officially made the Plaintiff the permanent manager of his

---

[4] The comments included "Indians don't know anything," (Jain July 18, 2006 Dep. 71, DE 58-7), made by coworker Tony Schroeder, and "[y]ou Indians don't know anything because they didn't make you head of department," (Jain July 18, 2006 Dep. 72, DE 58-7), made by coworker Scott Tirey.

[5] The exchange that the Plaintiff believed to be a threat on his life occurred between the Plaintiff and a co-worker, Kris Timmerson, on April 9, 2001. The dispute was over who would attend a training seminar. There is no allegation that the dispute was related to the Plaintiff's race, color, religion, national origin, or age.

group and gave him a three to four percent salary increase.  His position remained an L6 position. The Plaintiff alleges that during this time he was given tremendous job responsibilities without adequate staff support and an adequate adjustment in pay.

On April 16, 2002, the Plaintiff and Allendorph had a verbal altercation regarding the Plaintiff's supervision of Tim Noble.[6] During this heated exchange, Allendorph cursed at the Plaintiff, accused the Plaintiff of "insulting Americans," told the Plaintiff to go "back to your country," (Jain July 18, 2006 Dep. 112, DE 58-9) and yelled, "Tim is a good Christian. Do not insult him." (Aff. of Dr. Sunil Jain,  DE 58-31.) This exchange reduced the Plaintiff to tears, and Allendorph instructed the Plaintiff to go home. The Plaintiff was not permitted to return to the building for several days, and he was charged two and one-half days of vacation.

One month after the exchange between the Plaintiff and Allendorph, the Plaintiff received his first negative comments in a performance review.[7] In the Plaintiff's May 22, 2002, TPM, Allendorph commented on his confrontation with the Plaintiff by stating, "there was an extraordinary period of a couple of days in mid-April that displayed a side of Sunil that had not previously been seen." (Def.'s Mem. in Supp. of Mot. for Summ. J., App. A, Ex. 23, DE 57-6.) Allendorph then remarked that "Sunil is expected to continue to Assume Innocence, show

---

[6] Tim Noble began working for the Defendant around May 2000. The Plaintiff and Noble had a very contentious working relationship. This tension led to many of the subsequent meetings between the Plaintiff and his supervisors, during which meetings the Plaintiff alleges he was harassed.

[7] All of the Defendant's employees are subject to semi-annual employment reviews known as Total Performance Management reviews, or "TPMs." At the beginning of a calendar year the company establishes goals for employees. Progress towards those goals is then evaluated mid-year. At the end of the year, employees are graded on how well they addressed the goals. The reviews utilize a performance rating scale of 1 through 5, with 5 indicating "significantly exceeded expectations," 4 indicating "generally exceeded expectations," 3 indicating "met expectations," 2 indicating "met expectations with few exceptions, and 1 indicating "did not meet expectations." If an employee falls below a level 3 rating, the company creates a Performance Improvement Plan, or "PIP," which the employee must either comply with or face termination.

Respect, and to maintain a professional and level approach to his dealings with Tim." (*Id.*)

The Plaintiff responded in the same report that, "[i]t was unfortunate that the incident on April 16 happened and I take full responsibility for that." (*Id.*) The Plaintiff disagreed with Allendorph's characterization of the event and explained ". . . that my behavior was not the result of Tim's bad performance over the last several months, but because of his as well as of many others' extremely bad behavior for more than a year including one on April 15."

The Plaintiff's end-year performance rating, which came at the end of October 2002, was a level 3 "met expectations" because he "exceeded performance expectations with regard to his technical assignments, but has exhibited a few exceptions with the manager/employee relations skills." (*Id.*) At that time the Human Resources Director, Karen Goins, told the Plaintiff that he had to take his comments from the May 22 TPM about his heated exchange with Allendorph out of the report "or you'll be out of a job." (Jain July 18, 2006 Dep. 140, DE 58-10.)  His supervisor at that point, Rod Laukhuf, was also present for the meeting. Goins then told the Plaintiff, "[i]f you want to put nice comments, you put it, otherwise, don't put it." (*Id.*) The Plaintiff's comments were then removed, although the record is not clear whether this was with or without the Plaintiff's consent.

In August 2002, Allendorph ceased being the Plaintiff's supervisor, and the Plaintiff began answering directly to Rod Laukhuf.  Upon becoming the Plaintiff's manager, Laukhuf warned the Plaintiff that he was there to correct the Plaintiff and that the Plaintiff  needed to "start behaving properly with Americans." (Jain July 18, 2006 Dep. 132, DE 58-10). Beginning in February or March 2003, Laukhuf made several remarks about black employees to the Plaintiff, including "[t]he blacks will take over the whole company." (Jain July 18, 2006 Dep.

9

144, DE 58-10; Jain July 20, 2006 Dep. 8, DE 58-14.)[8]

The Plaintiff complained about Laukhuf's comments, as well as a few incidents where Laukfhuf raised his voice, to Tom Harting, who at this point in late March 2003 was his superior. Harting assured the Plaintiff that he would look into the matter. On May 19, 2003, Laukhuf met with the Plaintiff to administer the 2003 TPM. Laukhuf gave the Plaintiff a rating of 2, "meets expectations with few exceptions." Laukhuf explained that his rating was based on the Plaintiff's failure to develop a comprehensive plan for rebuilding the organization as well as several management and communication issues.[9]

Shortly thereafter, the Plaintiff met with both Harting and Laukhuf to discuss the TPM. The Plaintiff did not agree with the comments in the TPM and refused to sign off on the review, which greatly upset both Laukhuf and Harting. Laukhuf began shouting at the Plaintiff and Harting instructed the Plaintiff to "[a]ccept these things, these are your supervisor's notes." (Jain July 20, 2006 Dep. 19, DE 58-14.)  Harting ended with, "[y]ou cow kisser, you Indian." (*Id.*) Both Harting and Laukhuf alternated between shouting at the Plaintiff at times and laughing and making fun of him at others. The Plaintiff pleaded, "I'm having a nervous breakdown. Please stop it. I'll accept whatever you write. . . . Whatever you have written, I'll accept it." (*Id.* at 19-20.)

For Plaintiff's 2003 end-year performance review, conducted on October 31, Laukhuf

---

[8] The Plaintiff relayed these comment to  the Human Resources Department in December 2003. (Jain July 18, 2006 Dep. 145, DE 58-10.)

[9] Laukhuf did acknowledge that "Sunil has met most of his business and development goals to date . . . ." (2003 TPM, Def.'s Mem. in Supp. of Mot. for Summ. J., Ex. 24, DE 57-6.) However, Laukhuf noted that the Plaintiff was not "maintaining a positive attitude" and needed "to strengthen basic manager skills of organization and planning, time management, priority setting and overall more open communications in order to better manage the tasks at hand, with less stress." (*Id.*)

noted several areas of improvement, but he still believed that Plaintiff's performance warranted a rating of 2, "meets expectations with few exceptions."[10] The Plaintiff refused to sign this review. On December 12, 2003, the Plaintiff, Harting, Laukhuf, Tyree Harris (a Human Resources employee), and Pat Peters (who was there to take minutes of the meeting) met to discuss the TPM. The Plaintiff made several complaints about the previous meetings, but those complaints were omitted from the minutes. The minutes do note that, "Tom also stated that he was aware that Sunil has had a discussion with HR regarding an EEO issue that Tyree is currently investigating." (Dec. 12, 2003 Meeting Minutes, Def.'s Mem. in Supp. of Summ. J., App. A, Ex. 26, DE 57-7.) After giving the Plaintiff low performance review ratings, Laukhuf told him that it was because the Plaintiff had complained about Laukhuf.  Laukhuf stated, "I don't have any complaint against you except this rating I gave you because you complained." (Jain July 20, 2006 Dep. 27, 58-14.) After the 2003 year-end review, the Plaintiff was placed on his first Performance Improvement Plan ("PIP").

During the Plaintiff's employment with the Defendant, he made one formal complaint with the Human Resources Department in November 2003. The Plaintiff initiated this formal complaint with Lisa Morris, the Human Resources Manager at the time, alleging "unfair treatment." The matter was primarily handled by Tyree Harris. After interviewing the Plaintiff, Harris reported that the Plaintiff complained that, among other things,[11] Laukhuf "yelled at him

---

[10] Laukhuf observed that "Sunil has demonstrated an overall improvement in his attitude since midyear and has maintained a more positive approach to improving the working climate and building effective teams."  (2003 TPM, Def.'s Mem. in Supp. of Mot. for Summ. J., Ex. 24, DE 57-6.) Nonetheless, he felt that "Sunil needs to focus on being more proactive and take the initiative in developing sound project proposals, building thorough and realistic plans, and better follow-through on assignments and unresolved issues." (*Id.*)

[11] The Plaintiff also complained that he was subject to unreasonable job expectations, he was forced to work on a presentation at home, he received a low TPM rating because he complained about Harting's behavior, he was "demoted" within two weeks of when he began working for the Defendant, and that he had not received a pay

on several occasions, made racial comments about a co-worker, . . . . and discriminated against him because of his race." (Investigation Dispute Resolution Report, Def.'s Mem. in Supp. of Mot. for Summ. J, App. A, Ex. 17, DE 57-4.) Harris questioned seven witnesses and concluded that "[i]t does not appear Mr. Jain was subjected to a hostile work environment or given performance expectations based on his race."[12] (*Id.*) Harris also concluded that the Plaintiff was not subjected to any other form of racial discrimination. No further action was taken by the Defendant.

The Plaintiff now challenges the sufficiency of the investigation and Harris's competency to handle it since Harris's deposition testimony indicates that he was unsure of what type of investigation he was conducting and that his training consisted of only a one day seminar. (Tyree Harris Dep. 9, 23-24, 32, 45, DE 58-31.)  At the conclusion of the investigation, Lyons advised the Plaintiff not to "even think" of taking his complaint to the "higher ups."[13] (Jain Sept. 25, 2006 Dep. 97, DE 58-22.) On either January 7 or 8, 2003, Morris and Harris also told the Plaintiff not to take the complaint any further.

In late January 2004, International advertised an opening for an L7 position.[14] When the

_____

progression in two years. (Investigation Dispute Resolution Report, Def.'s Mem. in Supp. of Summ. J, App. A, Ex. 17, DE 57-4.)

[12] The Plaintiff does not allege that Harris failed to interview any particular relevant witnesses.

[13] It appears that the "higher ups" would be the corporate human resource department, as opposed to the local human resource department that the Plaintiff had been dealing with. *See* Def.'s Equal Employment Opportunity Policy, Def.'s Mem. in Supp. of Mot. for Summ. J., App. A, Ex. 7, DE 57.)

[14] The Defendant correctly points out that the Plaintiff's allegations regarding this position are possibly contradictory. It appears that the Plaintiff is alleging both that this was a new position that the Plaintiff wished to be promoted to and that the opening was the Plaintiff's own position. At this juncture, the Court must make all reasonable inferences in favor of the Plaintiff, and a reasonable jury could find that this new opening was both a higher and better position than the Plaintiff's L6 position, and that it was intended to subsume the Plaintiff's responsibilities in an effort to terminate the Plaintiff's employment.

Plaintiff expressed interest, Harting informed the Plaintiff that the position was intended to replace him. The Plaintiff gave Harting his resume to apply for the position anyway, but Harting refused to allow the Plaintiff to apply. The L7 position was eventually offered to Ron Schoon.

The Plaintiff alleges that Laukhuf and Harting continued to make comments related to his Indian descent and religion in 2004. These comments included, "[o]h you Indian will learn with a week. Within a week you will learn your lesson." (Jain Sept. 25, 2006 Dep. 150, DE 58-24.) They made these comments "all the time." (*Id.*) Ron Schoon, who later became the Plaintiff's supervisor, would sometimes laugh along with these comments.

In May 2004, Laukhuf issued the Plaintiff's mid-year TPM. Again, Laukhuf assigned the rating of 2, "meeting expectations with few exceptions." The comments in the report continued to focus primarily on management and communications issues.

In June 2004, Schoon became the Plaintiff's direct supervisor and was given the title "staff engineer." While Schoon supervised the Plaintiff, he too made remarks related to the Plaintiff's Indian descent. Schoon made a remark to the Plaintiff about "another Indian bringing the whole company down," (Jain Sept. 25, 2006 Dep. 154-55, DE 58-24), and Schoon implied that the Plaintiff was stealing from the company since "Indians in General Motors do that." (Jain Sept. 25, 2006 Dep. 156, DE 58-24.) Schoon then placed the Plaintiff on a second PIP on July 29, 2004. Schoon's concerns, as he outlined them in the PIP, were purportedly related to the Plaintiff's management and communication practices.

On October 4, 2004, the Defendant began preparations to terminate the Plaintiff. (Morris Oct. 4, 2004 E-mail, Pl.'s Mem. in Opp. to Mot. for Summ. J, App., Ex. 12, DE 58-31.) On October 11, 2004, the Plaintiff emailed Ravi Rawat, the deputy general manager, and

complained that he was being harassed and indicated that he thought the general manager of the company, Dee Kapur, should become involved in the situation. The Plaintiff did not contact Kapur directly because of the admonitions he received from the Human Resources department not to go to the "higher ups." Rawat advised the Plaintiff to take his complaints to the Plaintiff's boss, the Human Resources department, or the company's hotline. Rawat also suggested looking for a new job. On October 12, 2004, Schoon either "re-opened" the Plaintiff's PIP or "updated" it to include additional comments regarding the Plaintiff's management deficiencies. The parties do not agree how the added information should be characterized, and the Plaintiff alleges that "updating" or "re-opening" PIPs is not the company's typical practice.

On November 1, 2004, the Defendant terminated the Plaintiff's employment. Schoon met with the Plaintiff in the human resources office and informed the Plaintiff that "[b]ecause of your performance we are terminating your service." (Jain Sept. 25, 2006 Dep. 163, DE 58-25.) Mack Short (a Human Resource Generalist) informed the Plaintiff that he would receive separation pay. The meeting lasted about five or ten minutes.  The only participants in the meeting were Schoon, Harting, and Short. The decision to terminate was primarily Schoon's. However, with regard to the negative evaluations that culminated in the termination, Schoon remarked to the Plaintiff, "[i]t's Tom Harting who's driving the whole thing." (Jain Sept. 25, 2006 Dep. 161, DE 58-25). The Plaintiff received a box to collect all of his personal belongings and he was escorted out of the building. At the time the Defendant terminated the Plaintiff's employment, the Plaintiff was forty-six years old and practiced under the Hindu religion.

As summarized above, the crux of the factual dispute pertains to the series of evaluations and PIPs. At a minimum, both parties agree that the Plaintiff's "mastery of the technical aspects

14

of his job was generally adequate." (Def.'s Mem. in Supp. of Mot. for Summ. J. 1., DE 56.) As for every other aspect of the evaluations and PIPs, the parties are in complete disagreement.

The Defendant points to the multiple low ratings and negative comments regarding the non-technical aspects of the Plaintiff's performance in support of its contention that the termination was performance related. The Plaintiff asserts that these ratings and remarks are inaccurate and disingenuous. The Plaintiff also claims that every person that took part in a negative evaluation also made some type of harassing remark based on either the Plaintiff's race, national origin, religion, or age.

**B.      Procedural Background**

On March 17, 2005, the Plaintiff's counsel filed a Letter of Appointment with the Equal Employment Opportunity Commission ("EEOC") Indianapolis District Office along with a letter setting forth the Plaintiff's various claims against the Defendant. On March 22, 2005, the EEOC acknowledged receipt of the Plaintiff's filings, assigned the charge an EEOC number, and recommended mediation of the Plaintiff's claims. On March 31, 2005, the Plaintiff filed an Agreement to Mediate Plaintiff's complaints. On October 25, 2005, the EEOC issued Plaintiff a Notice of Right to Sue. The Plaintiff then filed his Complaint in this Court on January 19, 2006.

**TIMELINESS OF THE PLAINTIFF'S CLAIMS**

**A.      Title VII Claims**

As a threshold matter, the Defendant argues that all but one of the Plaintiff's Title VII claims are time barred. In order for the Plaintiff to assert claims under Title VII, he must show

that he filed a charge with the EEOC within 300 days of the alleged unlawful employment practices. 42 U.S.C. § 2000(e)(5)(1). The parties agree that this is the relevant time limit, but they disagree as to when the EEOC claim was filed and how the continuing violation doctrine should be applied, if at all.

**(1)     *EEOC Filing Date***

The Plaintiff contends that his EEOC filing date was March 17, 2005.  As evidence of this, the Plaintiff submitted a copy of the letter and accompanying attachments that he sent to the EEOC, which the EEOC received on March 17, 2005. The letter specifically states that its purpose is "to commence our suit on behalf of our client, Mr. Sunil Jain, against Navistar International Corporation and Navistar International Corporation d/b/a International Truck and Engine Corporation." (Patel Letter, Pl.'s Mem. in Opposition to Def.'s Mot. for Summ. J., Ex. 18, DE 58-33.) The letter also "sets forth the claims, circumstances surrounding the claims, relief sought, and a statement regarding mediation, including exhibits." (*Id.*)

 The EEOC responded to the Plaintiff's filing with a letter on March 22, 2005. The response letter indicates that the EEOC accepted the Plaintiff's March 17 filing as the commencement of an EEOC action, as the letter provides an EEOC number and recommends the Plaintiff's case for mediation. (EEOC Letter, Pl.'s Mem. in Opposition to Def.'s Mot. for Summ. J., Ex. 19, DE 58-35.)

The Defendant insists that the filing date of the EEOC charge is May 4, 2005. (Def.'s Mem. in Supp. of International's Mot. for Summ. J. 6, DE 56.) In support of this argument the Defendant provides a copy of the Plaintiff's Charge of Discrimination filed with the Indiana

Civil Rights Commission and the EEOC. (Def.'s Mem. in Supp. of Mot. for Summ. J., App. A, Ex. 34, DE 57-7.) The charge has the same EEOC number as the Plaintiff's March 17, 2005, submission. The Court is unable to read the date on the Charge of Discrimination, but the Defendant claims that the date is May 4, 2005, and the Plaintiff has not denied that the date on this document is May 4, 2005. The Defendant argues that the Plaintiff's March 17, 2005, correspondence between the Plaintiff and the EEOC was merely an "exchange of correspondence that precedes the filing of the Charge." (Def.'s Mem. in Supp. of Mot. for Summ. J., DE 56.)

While the Court recognizes that there are two different documents with two different dates filed by the Plaintiff with the EEOC asserting claims against the Defendant, the Defendant fails to point to any inadequacies in the March 17, 2005 filing that would render it merely "correspondence." Since the EEOC indicated that it accepted the March 17, 2005, letter as sufficient to commence the suit, it is not apparent how the Plaintiff's submissions could be inadequate. The Court therefore finds that the Plaintiff filed his charge with the EEOC on March 17, 2005. The Plaintiff is accordingly permitted to pursue any claims under Title VII that arose on or after May 21, 2004, 300 days before the March 17, 2005 letter.


**(2)**     ***Continuing Violation Doctrine***

The Plaintiff further argues that he is entitled under the continuing violation doctrine to relief for the Defendant's allegedly unlawful employment acts creating a hostile work environment that occurred prior to May 21, 2004. The Supreme Court's most recent explanation of this doctrine supports the Plaintiff's position. *National Railroad Passenger Corp. v. Morgan*

involved facts very similar to the Plaintiff's. 536 U.S. 101 (2002). In *Morgan*, the plaintiff alleged that he was "consistently harassed and disciplined more harshly than other employees on account of his race." *Id.* at 105. Many of the alleged discriminatory acts occurred more than 300 days prior to his filing a charge of discrimination, and some of the acts occurred less than 300 days prior to the filing. *Id.*

*Morgan* restricted the continuing violation doctrine by holding that discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. While discrete time barred acts are not actionable, the Court did allow that "[t]he existence of past acts and the employee's knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are timely filed." *Id.* In such a case, the prior acts serve as relevant and admissible evidence in support of the timely claims. *Id.*

 "Hostile environment claims are different in kind from discrete acts." *Id.* at 115. Accordingly, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117. Since "the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of his single claim." *Id.* at 118. As a result, "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* In other words, "[t]he Supreme Court treats a hostile work environment

as one unlawful employment practice. *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007) (citing *Morgan*, 536 U.S. at 115–21). "The employee may complain about any of the constituent acts, no matter how long ago they occurred as long as the charge is filed within 300 days of any harassing act." *Id.*

Although the Court in *Morgan* provided some flexibility to plaintiffs asserting hostile environment claims, "[h]aving given generously with one hand, the Court took some back with the other." *Pruitt v. City of Chi.*, 472 F.3d 925, 928 (7th Cir. 2006). While a plaintiff can recover for acts that occurred more than 300 days prior to an EEOC filing, these claims remain subject to equitable doctrines, including tolling or estoppel, although courts are to apply the doctrines sparingly. *Morgan*, 536 U.S. at 114.[15]

The Plaintiff alleges that he was subjected to racially and religiously derogatory remarks by his supervisors and coworkers and targeted with unfair performance review and improvement plans both before and after May 21, 2004. Accepting the Plaintiff's facts as true, and making all reasonable inferences in favor of the Plaintiff, as this Court must, the Court finds that the racially and religiously inspired harassing remarks and performance reviews[16] made prior to May 21 "are part of the same actionable hostile work environment practice," as they indicate a continuing and escalating pattern of comments and acts involving the same subject matter, the same target, and the same group of alleged harassers. *Id.* at 122; *see also Tinner v. United Ins. Co. of Am.*, 308

---

[15] While the Defendant generally objects to the timeliness of the Plaintiff's claims and accuses the Plaintiff of procrastinating, (Reply Mem. in Supp. of International's Mot. for Summ. J. 4, DE 56), the Defendant has not specifically requested the application of any equitable doctrines, nor has the Defendant addressed the elements of any relevant equitable doctrines. As such, the Court declines to recognize the applicability of any such defenses here.

[16] Even though the Plaintiff is permitted to argue that the unjustified performance reviews were based on his membership in a protected class and contributed to a hostile environment, the reviews in and of themselves do not constitute adverse employment actions. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996).

F.3d 697, 708 (7th Cir. 2002) (citing *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395

(7th Cir. 1999) (instructing lower courts to consider (1) whether the acts involve the same

subject matter, (2) the frequency with which the acts occur, and (3) the degree of permanence of

the alleged acts of discrimination that should trigger an employee's awareness and duty to assert

his rights)). The Court also finds that a reasonable jury could conclude that the Plaintiff acted

with appropriate haste in exhausting the Defendant's anti-harassment policies and then pursuing

relief through the EEOC filing.

Furthermore, the Court finds that at least some of the comments and reviews, those

occurring after May 21, 2004, fall within the statutory time period. The Plaintiff's hostile work

environment claims are therefore not time barred, and the Plaintiff, if his allegations are believed

by a jury, may recover for pre-May 21, 2004 conduct constituting his hostile work environment

claim. Discriminatory acts not supporting a hostile work environment claim that occurred

outside the 300-day window also may remain relevant to the Plaintiff's non-time-barred claims.

While the Plaintiff's hostile environment claims are not time barred, some of his other

claims are. The Supreme Court has explained that the continuing violation doctrine applies to

hostile work environment claims because "the actionable wrong is the environment, not the

individual acts that, taken together, create the environment." *Ledbetter v. Goodyear Tire &

Rubber Co., Inc.*, 127 S. Ct. 2162, 2175 (2007). The same logic does not apply for discrete acts

of discrimination, such as termination, failure to promote, or demotion. *Id.* at 2165 (citing

*Morgan*, 536 U.S. at 114). Instead, "a fresh violation takes place *when each act* is committed."

*Brown v. Ill. Dep't of Natural Res.*, No. 06-1552, 2007 WL 2410062, at *4 (7th Cir. 2007)

(citing *Ledbetter*, 127 S.Ct. at 2169). Accordingly, the 300-day clock begins when each discrete

act occurs.

The Plaintiff claims that he was demoted almost immediately once he began working for the Defendant. This occurred years before the EEOC filing, has no relationship to the hostile work environment claim, and is therefore time barred. *See Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) (citing *Pegram v. Honeywewll, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004)) ("A demotion, like other discrete acts of alleged discrimination, is an unlawful employment practice that must be brought to the EEOC's attention within 300 days of its occurrence."). The same is true for any other demotions, failures to promote, or inadequate salary raises that the Plaintiff suffered before May 21, 2004 (including the failure to promote the Plaintiff to an L7 position in May 2000 referenced in Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. 7, DE 58). While these claims remain relevant to the Plaintiff's hostile work environment claim, to the extent that the Plaintiff seeks to recover for these discrete acts independently, the Defendant's Motion for Summary Judgment is granted as to these claims.

**B.    ADEA Claims**

As both parties acknowledge, the ADEA requires the Plaintiff to demonstrate that he filed an EEOC charge within 180 days of an unlawful employment practice. 29 U.S.C. § 626(d)(1). The Defendant argues that the filing date for the EEOC charge is May 4, 2005, and the Plaintiff's age discrimination claim is therefore time barred. The Plaintiff counters that the EEOC filing date is March 17, 2005, less than 180 days after the termination of the Plaintiff's employment, and the Plaintiff's claim is timely.  The Court, having found that the EEOC filing date is March 17, 2005, also finds that the Plaintiff's age discrimination claim related to his

21

termination, which occurred on November 1, 2004, is likewise timely filed. However, there is no argument that any unlawful employment claims related to age discrimination that occurred prior to September 17, 2004, are saved by the continuing violation doctrine or any similar theory. Therefore, the Defendant's Motion for Summary Judgment is granted with respect to any age discrimination claims related to unlawful employment actions that occurred prior to September 17, 2004.

## ANALYSIS OF CLAIMS

### A.   Harassment and Hostile Work Environment

### (1)   *Applicable Legal Standards*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer–(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's ban on discrimination is violated when discrimination based on race, national origin, or religion creates a hostile or abusive work environment. *See Hardin v. S.C. Johnson & Sons*, Inc., 167 F.3d 340, 345 (7th Cir. 1999).

In order to prevail on a hostile work environment claim, the Plaintiff must show that his work environment was both subjectively and objectively hostile. *See Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). The harassment must have been unwelcome and based on his race, color, religion, or national origin. *See Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (citing *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036,

1043 (7th Cir. 2000)). The harassment had to have been so severe or pervasive as to alter the conditions of his work environment by creating a hostile or abusive situation.[17] *Id.*; *see also Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("It is important to recall that harassing conduct does not need to be both severe *and* pervasive."). Finally, there must be a legal basis for employer liability. *Williams*, 361 F.3d at 1029.

With respect to the last element, a basis for employer liability, the analysis depends on whether the alleged harassment was perpetrated by supervisors or coworkers. If the alleged harassment was perpetrated by supervisors, the employer is strictly liable unless the harassment did not result in a tangible employment action. *Williams*, 361 F.3d at 1029. If the alleged harassment was perpetrated by coworkers, then the employer is only liable if the plaintiff demonstrates that the employer was "negligent either in discovering or remedying the harassment." *Id.*

The Defendant does not contest that the Plaintiff has at least demonstrated a genuine issue of material fact as to the whether the alleged harassment was unwelcome and whether it related to the Plaintiff's membership in a protected class. Rather, the Defendant asserts that the Plaintiff has failed to make a sufficient showing that the harassment was severe or pervasive and that there is a basis for employer liability.

**(2)**    ***Severity and Pervasiveness of the Harassment***

---

[17] The Seventh Circuit has explained that severity and pervasiveness are inversely related. "One instance of conduct that is sufficiently severe may be enough. Conversely, conduct that is not particularly severe but that is an incessant part of the workplace environment, may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (citing *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999)).

The Defendant argues that the Plaintiff fails to establish a hostile work environment because the Plaintiff only claims "one incident of allegedly harassing conduct based on a protected category during the relevant time." (Mem. in Supp. of International's Mot. for Summ. J. 13, DE 39.) The incident this quote refers to is the statement allegedly made by Schoon, the Plaintiff's supervisor, implying that Indians are dishonest. As the Court discusses above, the comments made during this period by the Plaintiff's supervisors and coworkers are not the only acts for which the Plaintiff may recover. Rather, these are the acts that save the Plaintiff's suit from being time barred. It is simply not true that the Plaintiff has only complained of one incident of harassing conduct based on a protected category.

While the Plaintiff may recover for offensive remarks and acts that occurred outside the 300-day EEOC filing window that created a hostile work environment, the Defendant is correct that some of the Plaintiff's claims either are discrete acts separate from the hostile work environment and are accordingly time barred, are unrelated to a protected class, or are unsupported by the proffered evidence. The Plaintiff claims that he was "harassed when his work load was systematically increased to a point where Dr. Jain was doing the work of at least three full time persons working 10-12 hour days, including the weekends." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 7, DE 58.) However, the Plaintiff fails to provide any evidence in support of this contention other than his own deposition statement where he states this claim. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. App. A-9, DE 58.) While the Plaintiff certainly has personal knowledge of his own workload, the Plaintiff does not provide any admissible evidence that his workload was greater than that of similarly situated employees or that any increased workload was on account of his membership in a protected class. The Court

24

will therefore grant the Defendant's Motion for Summary Judgment as to this claim. Similarly, as discussed above, the Defendant's failure to promote the Plaintiff to an L7 position in May 2000 is well outside the 300 day window and distinct from the hostile work environment. This claim is accordingly time barred. The Court will grant the Defendant's Motion for Summary Judgment as to this claim.

Once the increased workload and time barred failure to promote claims are set aside, the Plaintiff's remaining allegations are that he was subjected to constant insults related to his membership in a protected class by coworkers and supervisors, to numerous unjustified and untrue TPMs and PIPs, and to being locked out of the building for several days. There is no question that the Plaintiff subjectively perceived this harassment to be severe and pervasive. The Defendant does not deny that the Plaintiff felt his work environment was "hell" and that the Plaintiff was reduced to tears at one point.

Similarly, there can be no question that a reasonable jury, believing the Plaintiff's accusations, could likewise find this type of harassment objectively severe or pervasive. A jury will be required to consider several factors, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002) (citations omitted). As the Defendant has observed, the Plaintiff "claims that he was subjected to a steady stream of harassment from virtually every person with whom he came into contact." (Mem. in Supp. of International's Mot. for Summ. J. 2, DE 39.) This harassment, the Plaintiff claims, often took the form of comments related to his race, national origin, ethnicity and religion. Such an allegation, if true, is the

epitome of pervasive harassment, and as such is surely sufficient in light of the *Hilt-Dyson*

factors for summary judgment purposes to present a genuine issue of material fact as to whether

"the harassment was so severe and pervasive so as to alter the conditions of his work

environment by creating a hostile or abusive situation." *Williams*, 361 F.3d at 1029.


**(3)     *Basis for Employer Liability***

The parties are in agreement that this prong of the analysis is governed by the companion

cases of *Burlington Industries., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of

Boca Raton*, 524 U.S. 775 (1998), and their progeny. The parties disagree as to the application of

*Ellerth/Faragher* to the pending case.

The *Ellerth/Faragher* cases establish strict liability for harassment inflicted by

supervisors, subject to an affirmative defense that the harassment did not result in a tangible

employment action.[18] *Williams*, 361 F.3d at 1029 (citing *Mason*, 233 F.3d at 1043). If an

employer asserts this affirmative defense, the employer must show: (1) that the employer

exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that

"the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.

"No affirmative defense is available, however, when the supervisor's harassment culminates in a

tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.*

Employer liability for a hostile work environment created by coworkers, on the other hand, is

---

[18] A "tangible employment action" means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

determined under a negligence standard. *Id.* "[T]he employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent harassment from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).

The Defendant argues that strict liability does not apply here because the tangible adverse employment action was not undertaken by the harassing supervisor. The Defendant asserts that "Ron Schoon, the supervisor who initiated Plaintiff's discharge, had nothing whatsoever to do with the events that purportedly form the basis for Plaintiff's unsupported allegations of harassment and discrimination." (Def.'s Reply Mem. in Supp. of International's Mot. for Summ. J. 5, DE 59.) This is wrong. The Plaintiff does allege that Schoon participated in the events that form the basis for the allegations of harassment and discrimination. The Plaintiff alleges that Schoon made comments about Indians bringing the company down and that Schoon accused the Plaintiff of stealing from the company because Schoon believed that was the usual practice of Indians in similar companies.[19] (Jain Sept. 25, 2006 Dep. 154–56, DE 58–24.)

Even if Schoon was not the harassing supervisor, the Plaintiff asserts a "cat's-paw" theory. If the person carrying out the tangible adverse employment action is merely the conduit of the harassing or discriminating supervisor, then the employer cannot escape liability. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The Plaintiff claims that Schoon told him that Harting, another allegedly harassing supervisor, was the one "who's driving the whole

---

[19] The Seventh Circuit has explained that the "conduct need not have been explicitly . . . racial in order to create a hostile environment . . . . The complained of conduct must have . . . [a] racial character *or purpose* to support a Title VII claim. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir. 1989)).

thing." (Jain Sept. 25, 2006 Dep. 161, DE 58-25.) While it is up to the jury to determine the precise meaning of the statement and whether Schoon actually made it, at this juncture it is enough to create a genuine issue of material fact.

Beyond the cat's paw theory, there is also a genuine issue of material fact as to the remaining elements of the *Ellerth/Faragher* defense for harassment that did not culminate in tangible employment action. The parties seem to be in agreement that "International has numerous policies and materials relating to various EEO issues, including but not limited to, harassment and discrimination," but they disagree about the manner in which those policies were distributed and enforced. (Def.'s Reply Mem. in Supp. of International's Mot. for Summ. J. 7, DE 59.) The Defendant repeatedly emphasizes that the Plaintiff only made one formal complaint to the Human Resources Department, which the Defendant believes was handled appropriately. However, pursuant to the Defendant's harassment policy, the Plaintiff claims he complained numerous times to his supervisors and his supervisors' supervisors and that almost all of those complaints were ignored. As the Seventh Circuit has explained, "[d]oing nothing after receiving multiple complaints about serious conditions is a straight road to liability under Title VII." *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007) (citing *EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516 (7th Cir. 2001) (en banc)). Furthermore, as to the formal complaint made to the Human Resources Department, the parties do not even agree as to how the investigation was conducted.

The deposition testimony of the Plaintiff and the supervisors are in conflict as to whether the Plaintiff was complaining about matters related to his membership in a protected class or about other workplace issues, but the credibility of these claims is for a jury to determine. These

conflicting factual allegations relate both to whether the Defendant exercised reasonable care to prevent and correct promptly harassing behavior, and whether the Plaintiff took advantage of preventative or corrective opportunities provided by the employer to avoid harm otherwise.

The contested issues as to how the Defendant responded to the Plaintiff's complaints regarding workplace harassment are also enough for the Plaintiff's claims to survive summary judgment with respect  to the alleged harassment from coworkers. If the jury believes the Plaintiff's allegation that his repeated complaints regarding coworkers' remarks were ignored, a reasonable jury could find that the Defendant was negligent in failing to promptly and appropriately take corrective action that was reasonably likely to prevent harassment from recurring.

**B.     Termination**

**(1)     *Applicable Legal Standards***

The Plaintiff has chosen the *McDonnell Douglas* indirect method to show that the Defendant's decision to terminate his employment was motivated by a prohibited animus. Under this approach, he must first establish a prima facie case of race, national origin, and religious discrimination. To do that, he "must demonstrate that: "(1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated others not in his protected class received more favorable treatment." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir.

2005). If he succeeds in establishing the prima facie case of race or national origin discrimination,

> the burden of production shifts to the defendant to offer a permissible, noninvidious reason for the alleged discrimination. If the defendant meets this production burden, the plaintiff may then rebut that evidence by showing that the employer' reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (citations omitted).

"Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). If pretext is demonstrated, the case must go to trial. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001).[20]

The Defendant does not contest that the Plaintiff has made a sufficient showing under the first and third prongs of the burden-shifting test. Rather, the Defendant argues that, (1) the "Plaintiff cannot establish that he was performing his job at a satisfactory level," (2) the Plaintiff has failed to "identify a similarly-situated employee outside of the protected class who was treated more favorably," (3) the Defendant had a legitimate, non-discriminatory reason for the adverse employment action, and (4) the Plaintiff "cannot produce any admissible evidence whatsoever to show that his termination was pretextual." (Def.'s Mem. in Supp. of International's Mot. for Summ. J. 14, DE 56.) The Court addresses these arguments in order.

---

[20] The analysis is the same under both Title VII & § 1981. *See Bratton v. Roadway Package Sys.*, 77 F.3d 168, 176 (7th Cir. 1996.) Under the ADEA, the Plaintiff must prove, as part of his prima facie case, that the similarly situated employee was at least ten years younger than the Plaintiff. *Fischer v. Wayne Dalton Corp.*, 139 F.3d 1137, 1141 (7th Cir. 1998).

**(2)**     *Application*

(a)     *Adequacy of Plaintiff's Job Performance*

In determining whether the Plaintiff performed well enough to meet the Defendant's legitimate expectations, "the relevant time to consider is the time of discharge." *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F3d. 1106, 1113 (7th Cir. 1998) (citing *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)). "A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work." *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 (7th Cir. 1988) (citing *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir. 1986)). While such testimony is sufficient for the prima facie case, it is insufficient alone to show pretext. *Gustovich v. AT&T Commc'ns, Inc.* 972 F.2d 845, 848 (7th Cir. 1992) ("Such statements may create a material dispute about the employee's ability but do nothing to create a dispute about the employer's honesty–do nothing, in other words, to establish that the proffered reason is a pretext for discrimination.").

The Plaintiff offers his own testimony in support of his claim that he was performing satisfactorily and meeting the legitimate expectations of the Defendant. In support of that testimony, the Plaintiff offers evidence of numerous awards he received for his work as well as other recognition bestowed upon him by the Defendant. The Defendant responds that during the relevant time period, the time surrounding the termination, the Plaintiff received negative performance reviews. These performance reviews present a genuine issue of material fact as to

the Plaintiff's prima facie case, and they are of limited use since the Plaintiff alleges that the

evaluators were also the harassers and that their discriminatory views tainted their evaluation of

his work performance. The Plaintiff therefore has satisfied this portion of the burden-shifting

analysis. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 2007 WL 2230095, at *4–5

(7th Cir. 2007) (merging prongs two and three of the burden-shifting analysis).


(b)     *Similarly Situated Employee*

        To demonstrate that another employee was similarly situated, the Plaintiff "must show

that there is someone who is directly comparable to [him] in all material respects." *Patterson v.*

*Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citing *Greer v. Bd. of Educ.*, 267 F.3d

723, 728 (7th Cir. 2001)). To determine whether the Plaintiff has met this burden, "a court must

look at all relevant factors, the number of which depends on the context of the case." *Radue v.*

*Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). These factors include whether the

employees dealt with the same supervisor, were subject to the same standards, and "whether the

employees had comparable 'experience, education and qualifications' provided that the

employer took these factors into account when making the personnel decision in question. "

*Patterson*, 281 F.3d at 681 (quoting *Radue*, 219 F.3d at 617).

        In evaluating these factors, the Seventh Circuit has repeatedly emphasized that the

requirement "should not be applied mechanically or inflexibly." *Hull v. Stoughton Trailers, LLC*,

445 F.3d 949, 952 (7th Cir. 2006); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th

Cir. 2007); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007); *Elkhatib v.*

*Dunkin Donuts, Inc.*, 493 F.3d. 827, 831 (7th Cir. 2007). There is no "magic formula for

determining whether someone is similarly situated." *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001). The Court must not "lose sight of the common-sense aspect of this inquiry . . . [into whether there are] enough common features between the individuals to allow a meaningful comparison[.]" *Humphries*, 474 F.3d at 405 (7th Cir. 2007). The similarly situated employee element "[i]s not an unyielding, inflexible requirement that requires near one-to-one mapping between employees . . . ." *Id.* In the end, "the fundamental issue remains whether [the] distinctions are so significant that they render the comparison effectively useless." *Id.*

The Plaintiff argues that there is at least one similarly situated employee outside of the protected class who was treated more favorably than him: Leonara Hardee. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. 18, DE 58). The Plaintiff contends, and the Defendant does not seem to disagree, that "[t]hey both were managers of their respective sections, reporting to the same supervisor." (*Id.*) The Plaintiff argues that the disparate treatment was that, at the time he was not allowed to apply for a promotion, Hardee was elevated to an L7 position. Additionally, Hardee was not subject to all the forms of harassment that the Plaintiff alleges he endured. The Defendant responds that the two are not similarly situated because Hardee held a different position and because Hardee did not exhibit any work performance deficiencies.

It is not necessary that the two employees hold the exact same position. *See Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 383 (7th Cir. 2000). It is enough that they were both L6 managers reporting to the same supervisor. Defendant's argument that the two employees are dissimilar because Hardee did not receive negative performance evaluations from the Defendant also fails since the Plaintiff alleges (with supporting evidence) that the negative evaluations of him were related to his membership in a protected class and in retaliation for complaining about

33

unlawful employment practices. The Plaintiff even alleges that one supervisor, Laukhuf, specifically told the Plaintiff that the only reason for a negative review was that the Plaintiff had complained about Laukhuf. (Jain July 20, 2006 Dep. 27, DE 58-14.)[21]

The Court finds that the Plaintiff has sufficiently established this element of the burden-shifting analysis. Having established his prima facie case, the burden now shifts to the Defendant to provide a non-discriminatory basis for the Plaintiff's termination.

(c)     *Defendant's Proffered Non-Discriminatory Basis for Plaintiff's Termination*

As the Seventh Circuit has observed, there is a great deal of overlap between the analysis of whether an employee fulfilled the legitimate performance expectations of the employer, the reasons for the discharge, and whether the reason given is pretextual. *See Fortier v. Ameritech Mobile Comm'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). This case highlights that overlap.

The Defendant claims that the "Plaintiff was terminated because he failed to improve his work performance after being placed on two separate PIP's within a year." (Def.'s Mem. in Supp. of International's Mot. for Summ. J.20, DE 56.) However, the Plaintiff has introduced evidence, which a reasonable jury could believe, indicating that the PIPs were created to harass the Plaintiff and in retaliation for complaining about unlawful employment practices. This both undermines the Defendant's proffered reason for termination as well as creates a sufficient basis to infer pretext. The Defendant emphasizes that these evaluations were made by multiple

---

[21] The Defendant argues that, "[i]n this instance, a similarly situated, favored employee would be one who had been placed on two separate PIPs in less than a year but who was *not* terminated." (Pl.'s Mem. in Supp. of International's Mot. for Summ. J. 19, DE 56.) This is the type of requirement that the Seventh Circuit rejected in *Humphries v. CBOCS West, Inc.* 474 F.3d 387 (7th Cir. 2007). The court rejected the employer's argument that the similarly situated employee "must be essentially identical to the plaintiff." *Id.* at 405.

supervisors, but the Plaintiff has alleged that each of his supervisors participated in creating the hostile work environment. Even Schoon, the third supervisor to render a negative evaluation and to ultimately terminate the Plaintiff's employment, allegedly made harassing remarks and acknowledged that the termination was being driven by another allegedly harassing supervisor.

The Plaintiff has submitted enough admissible evidence to defeat the Defendant's proffered non-discriminatory basis for termination at the summary judgment juncture. To the extent that the Defendant has carried its burden of production, the Plaintiff's evidence suggesting that the individuals that provided the negative evaluations did so as a result of discrimination based on the Plaintiff's membership in a protected class would be enough at this phase of the litigation, construing all inferences in favor of the Plaintiff, to establish that the Plaintiff's performance was not the real reason for the negative evaluations.

**(3)**      ***Age Discrimination***

While the Plaintiff's claims with respect to the termination based on race and religion survive summary judgment, the Defendant is correct that there are no genuine issues of material fact as to the Plaintiff's age discrimination claims, and the Defendant is therefore entitled to judgment as a matter of law with respect to those claims. Harting informed the Plaintiff that he would not be permitted to apply for the L7 position in January 2004, in part because of his age, well outside the 180 day window for filing a claim, which makes that claim time barred. *See Del. State Coll. v. Ricks*, 449 U.S. 250 (1980); *see also Gustovich v. AT&T Comm'ns, Inc.*, 972 F.2d 845, 847 (7th Cir. 1992) (per curiam) ("Time starts to run under the ADEA when an employer communicates an adverse employment decision to employee, not when the full consequences of

35

that action are felt.").

As for the termination claim, the Plaintiff offers no evidence, other than the fact that his replacement was younger, that the termination was related to his age. While this is a necessary part of his age discrimination claim, it is nowhere near sufficient. The Plaintiff seems to acknowledge this in that his brief does not even attempt to tie the termination to the Plaintiff's age other than by noting the age of his replacement.  The Defendant's Motion for Summary Judgment as to the ADEA claims is therefore granted.

## C.     Retaliation

"Title VII prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (citing 42 U.S.C. § 2000e-3(a)).  The Plaintiff may prove his retaliation claim through either the direct method or the indirect burden-shifting method. *Id.* (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728). The Plaintiff has chosen to proceed with the direct method.

In order for the Plaintiff to establish a prima facie case of retaliation under the direct method, he must present evidence that does not "resort to inferences from circumstantial evidence" to establish the elements of his case. *Sylvester v. SOS Children's Vill. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Direct evidence can be either "an outright admission by the decisionmaker that the challenged action was undertaken" because of the Plaintiff's protected activity, or a "convincing mosaic of circumstantial evidence that points directly" to the same conclusion. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal

36

quotation marks omitted) (citing *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)).  The

elements of the prima facie case under the direct method are that the Plaintiff: (1) engaged in a

statutorily protected activity, (2) suffered an adverse employment action, and (3) there is a causal

connection between the two. *See Kodl v. Bd of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562

(7th Cir. 2007) (citing *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).

The parties do not dispute that the Plaintiff has carried his burden with respect to the first

and second elements. Rather, the Defendant argues that there is no causal link between the

Human Resources complaint and the termination. In support of this argument, the Defendant

asserts that the Plaintiff was fired eleven months after the Plaintiff's Human Resources

complaint and that Schoon, who was primarily responsible for the termination, was not

employed with the Defendant when the Plaintiff made his complaint. The Plaintiff responds by

arguing that while the Plaintiff was actually terminated eleven months after the complaint, his

position was posted just a few weeks after the complaint.[22]

The evidence presented to the Court by the parties presents a genuine issue of material

fact as to when the Plaintiff's position was posted and why he was terminated. The Defendant

certainly points to several pieces of evidence indicating that the Plaintiff was terminated because

of poor performance reviews. But the Plaintiff also presents evidence that at least some of those

performance reviews were negative because of the Plaintiff's complaints regarding unlawful

employment practices. While the Defendant argues it is implausible to believe that the Plaintiff's

position was posted weeks after his human resources complaint, the Plaintiff introduces

evidence, including the statements of superiors, that a reasonable jury could believe indicates the

---

[22] The Plaintiff also claims he suffered other retaliatory acts beyond the termination. He is foreclosed from recovering under a retaliation theory for any of those acts that occurred prior to May 21, 2004.

job was in fact posted in January in response to his complaints of discrimination.

The evidence indicates that Schoon was not employed with the Defendant at the time of the complaint, but according to the Plaintiff's evidence, Schoon informed the Plaintiff that Harting, who allegedly called the Plaintiff a "cow kisser" and told the Plaintiff that the open position was to replace him, was "driving the whole thing." (Jain Sept. 25, 2006 Dep. 161, DE 58-25). The Defendant repeatedly protests that this evidence primarily derives from the Plaintiff's own testimony and is not supported by the testimony of the Defendant's other employees. This goes to the weight of the evidence, which is not a matter for summary judgment. There is no motion to strike any of the Plaintiff's proffered evidence, and all of the statements relied upon by the Court are admissible. As such, the Plaintiff has made a sufficient showing to present genuine issues of material fact as to whether the Plaintiff's employment was terminated as a result of his complaint to the Human Resources Department.

**D.     Indiana Common Law**

The Plaintiff's complaint states that he is bringing claims under "the Indiana Common Law." The complaint does not specify what common law claims the Plaintiff would be pursuing. The Plaintiff's Statement of Genuine Issues explains that the common law claims are "for intentional infliction of emotional distress, mental anguish, and humiliation." (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. App. A-21, DE 58-2.) The Defendant's Reply Memorandum argues that "Plaintiff's Complaint does not include claims under Indiana state law for intentional infliction of emotional distress, mental anguish, and/or humiliation." (Def.'s Reply Mem. in Supp. of Mot. for Summ. J. App. 34, DE 59-2.) This is the extent of the argument from the

parties regarding the Indiana common law claims. Neither side addresses the underlying merits of the claims.

The Federal Rules of Civil Procedure only require notice pleading, which means a Plaintiff's claim takes the form of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). "[T]he correlation of facts to theory come[s] later in the process." *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 733 (7th Cir. 1999).

If the Defendant was unsure of what the Plaintiff's precise Indiana common law claims were, the discovery process presented the opportunity to learn. If, on the other hand, the Defendant was aware of the common law theories but felt that the complaint did not support those theories, then the summary judgment motion should have identified any inadequacies. Because the Defendant has failed to identify any specific inadequacies in the Plaintiff's complaint with respect to the common law claims, the Court will deny summary judgment as to those claims.

## CONCLUSION

The parties in this case have two starkly different views of the Plaintiff's period of employment with the Defendant. The Plaintiff presents admissible evidence supporting the view that he was constantly tormented with comments related to his Indian descent and his religion, that he frequently complained to his supervisors about this behavior, that his complaints were ignored, that he was punished for complaining, and that his negative performance reviews were

just further acts of harassment. The Defendant presents admissible evidence indicating that the Plaintiff was hardly, if ever, subject to inappropriate behavior from coworkers and supervisors, failed to take advantage of the Defendant's anti-harassment procedures, and was terminated due to poor performance. Because these contrasting perspectives are supported by admissible evidence, a jury must decide which story is more credible.

**ORDER**

For these reasons, the Defendant's motion for summary judgment is GRANTED in part and DENIED in part. The motion is granted with respect to the age discrimination claim and also as to any time barred claims based on race, color, religion, or national origin that are discrete from the hostile work environment claim. The motion is denied with respect to the hostile work environment claim, the wrongful termination based on race, color, religion and national origin claim, and the retaliation claim. The motion is denied with respect to the Indiana common law claims.

SO ORDERED on October 3, 2007.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION